IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MUSTAFA-EL K.A. AJALA,
formerly known as Dennis E. Jones-El,

                Plaintiff,

      v.

KELLI WEST, RICK RAEMISCH,
TODD OVERBO, PETER HUIBREGTSE
and GARY BOUGHTON,

                Defendants.

ORDER

13-cv-546-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     Plaintiff Mustafa-El K.A. Ajala, formerly known as Dennis Jones-El, is proceeding on a claim that defendants Kelli West, Rick Raemisch, Todd Overbo, Peter Huibregtse and Gary Boughton are refusing to allow plaintiff to wear his kufi outside his cell and the chapel, in violation of the Religious Land Use and Institutionalized Persons Act, the free exercise clause, the establishment clause and the equal protection clause. Defendants have filed a motion for summary judgment, dkt. #11, which is ready for review.

     Unfortunately, defendants' motion raises a number of questions that the parties do not answer. First, it is undisputed that plaintiff has been housed in segregation since he has been confined at the Wisconsin Secure Program Facility, Dfts.' Rep. to Plt.'s Resp. to Dfts.' PFOF ¶ 26, dkt. #27, but neither side identifies when plaintiff is scheduled to be released from segregation. This is important because the justifications for restricting religious

1

headgear could be different for prisoners in segregation than for prisoners in general population and because defendants suggest that their rules for wearing headgear are different for prisoners in segregation than they are for other prisoners. Compare id. at ¶ 52 ("Inmates are allowed to order and wear some approved headgear outside of their cells, such as stocking hats, baseball caps, crusher khaki caps, and sweatbands from approved vendors in basic neutral colors, such as gray, white and green.") with id. at ¶ 64 ("Inmates in segregation are escorted by staff when outside of their cells, and the wearing of headgear of any type is prohibited during escorts to recreation, visits, etc.").

Both sides seem to assume that plaintiff is challenging restrictions on wearing kufis in both segregation and in general population, but if plaintiff is going to remain in segregation for the foreseeable future, then it is not clear whether he has standing to challenge the restrictions on prisoners in general population.   Clapper v. Amnesty International USA,  133 S. Ct. 1138, 1147 (2013) ("[W]e have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact and that allegations of possible future injury are not sufficient [to demonstrate standing.]") (internal quotations and alterations omitted); Texas v. United States, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). Accordingly, I am directing the parties to show cause why plaintiff's claim should not be limited to challenging restrictions on prisoners like him who are housed in segregation.

A second, related problem with the parties' filings is that they conflate many of their

2

arguments regarding the rules in segregation with their arguments regarding the rules in general population, even though defendants acknowledge that both the rules and the justifications may be different  in the different custody statuses.  Accordingly, in their response to this order, the parties should supplement their summary judgment materials in a number of ways.

First, the parties should identify with more specificity the differences between the prison's rules regarding wearing religious headgear in segregation and general population. This directive is intended primarily for defendants because they are most likely to have access to this information, but plaintiff is free to address this issue as well if he has personal knowledge of relevant facts.

Defendants provided one proposed finding of fact about this issue (no. 52), but it is incomplete.  For example, defendants say that, in segregation, the "wearing of headgear of any type is prohibited during escorts to recreation, visits, etc." but they do not explain whether the "etc." means that headgear is always prohibited outside the cell or if there are some situations in which headgear is permitted.

Second, with respect to each of the justifications that defendants offered for restricting the wearing of kufis, the parties should address individually how those justifications apply in segregation and in general population instead of conflating those arguments. For example, arguments regarding concerns about using kufis to hide contraband might be stronger for prisoners in segregation, but concerns about other prisoners being offended by the kufi might be weaker in segregation in light of the limited group activities

3

for those prisoners.

Third, to the extent defendants are relying on plaintiff's status in segregation as a justification for prohibiting plaintiff from wearing a kufi, the parties should address the question whether defendants should be required to consider plaintiff's individual circumstances rather than simply his status in segregation. E.g., Haight v. Thompson, 763 F.3d 554, 562 (6th Cir. 2014) ("Rejecting accommodation requests on the ground that an exception to a general prison policy will make life difficult for prison wardens is a fine idea in the abstract . . . but it has no place as a stand-alone justification under RLUIPA."); Yellowbear v. Lampert, 741 F.3d 48, 57 (10th Cir. 2014) (RLUIPA requires that government "prove the 'compellingness' of its interest in the context of 'the burden on that person'—suggesting an inquiry that proceeds in light of the particular burden the government has placed on the particular claimant."); Spratt v. Rhode Island Dept. of Corrections, 482 F.3d 33, 39, 40 n. 9, 41 (1st Cir. 2007) (rejecting prison officials' "all or nothing" argument and finding that officials "must . . . establish that prison security is furthered by barring [the plaintiff] from engaging in" the disputed conduct); Beebe v. Birkett, 749 F. Supp. 2d 580, 588 (E.D. Mich. 2010) ("The defendants have the burden of demonstrating that the policy directive is the least restrictive means to achieve security as applied to [the plaintiff]."). Further, to the extent that defendants have not yet considered plaintiff's individual circumstances, the parties should address the question whether any injunctive relief plaintiff receives in this case should be limited to directing defendants to consider those circumstances.

4

Fourth, the parties should address the issue raised in a similar case, Caruso v. Zenon, 2005 WL 5957978, at *20 (D. Colo. 2005), which I have attached to this order. In Caruso, the court considered whether other types of headgear, such as a stocking cap, could serve a Muslim prisoner's religious desire to cover his head while also addressing the prison officials' concerns about using the kufi as a gang symbol and about the potential offense it could cause non-Muslim prisoners. Perhaps a similar solution would be appropriate in this case. In his declaration, plaintiff says that his religious beliefs require him to wear a head covering, but he does not say that the head covering must be a kufi. Plt.'s Decl. ¶ 4, dkt. #25.

Finally, the parties should address the question raised in cases such as O'Bryan v. Bureau of Prisons, 349 F.3d 399, 401-02 (7th Cir. 2003), regarding the extent to which prison officials need to adduce specific evidence under RLUIPA to show that a prisoner's religious exercise will create a security problem rather than rely on speculation, particularly when the concern is the potential reaction of other prisoners to the religious exercise at issue.

## ORDER

IT IS ORDERED that the parties may have until February 20, 2015, to submit supplemental materials addressing the questions raised in this order. If the parties do not respond by then, I will dismiss for lack of standing plaintiff's challenge to the restriction on

5

wearing a kufi by prisoners in general population and limit my consideration to prisoners in

segregation.

Entered this 14th day of January, 2015.

BY THE COURT:

/s/
BARBARA B. CRABB
District Judge

6

2005 WL 5957978
Only the Westlaw citation is currently available.
United States District Court,
D. Colorado.

Ronald Anthony Vashone CARUSO, Plaintiff,

v.

Carl ZENON, Warden, Arkansas Valley Correctional
Facility; katherine sanguinetti, Chief of Community
Resources, Colorado Department of Corrections;
Donna Zavislan, Food Services and Laundry
Program Manager, Colorado Department
of Corrections; and A.J. Trujillo, Volunteer
Coordinator, Arkansas Valley Correctional Facility,
each in their official capacities, Defendants.

No. 95–MK–1578 (BNB).    |    July 25, 2005.

**Attorneys and Law Firms**

Mark T. Baker and J. Eric Elliff, Morrisson & Foerster, LLP
and Diane King, King & Greisen, LLP, for Plaintiff.

James X. Quinn and Nicole S. Gellar, Office of the Attorney
General, State of Colorado, for Defendants.

James D. Todd, Jr., United States Department of Justice, for
Intervenor United States of America.

## OPINION

MARCIA S. KRIEGER, District Judge.

**\*1 THIS MATTER** comes before the Court following a
bench trial and submission of the parties' written closing
briefs (# 293, 294). [1] Upon consideration of the evidence and
arguments, the Court makes the following findings of fact and
conclusions of law.

### JURISDICTION

The Court has subject-matter jurisdiction over this matter
pursuant to 28 U.S.C. § 1331.

### ISSUES

The Plaintiff, Ronald Anthony Vashone–Caruso
("Mr.Vashone–Caruso"), is an inmate in the custody of the
Colorado Department of Corrections. He brings this action
seeking to engage in several religious practices: to eat an
Islamically-approved diet, to wear a religiously-approved
headcovering, and to participate in group religious education
classes.

He asserts a total of six claims: (i) a claim for declaratory
relief that the Defendants [2] are violating his First Amendment
rights under the Free Exercise clause by denying him a
suitable religious diet in violation of 42 U.S.C. § 1983
and the Religious Land Use and Institutionalized Persons
Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.;* (ii) a claim
for declaratory relief that the Defendants are violating his
Fourteenth Amendment rights under the Equal Protection
claims by denying him a suitable religious diet while making
such a diet available to inmates of other religions; (iii) a
claim for declaratory relief that the Defendants are violating
his First Amendment rights under the Free Exercise clause
by denying him access to weekly religious education classes
in violation of 42 U.S.C. § 1983 and RLUIPA; (iv) a claim
for declaratory relief that the Defendants are violating his
Fourteenth Amendment rights under the Equal Protection
claims by denying him access to weekly religious education
classes while making such classes available to inmates of
other religions; (v) a claim for declaratory relief that the
Defendants are violating his First Amendment rights under
the Free Exercise clause by denying him a suitable religious
diet in violation of 42 U.S.C. § 1983 and RLUIPA by denying
him the opportunity to wear religious headwear; and (vi) a
claim for declaratory relief that the Defendants are violating
his Fourteenth Amendment rights under the Equal Protection
claims by denying him the ability to wear religious headwear
while making that opportunity available to inmates of other
religions.

### FACTS

**A. General background**
At all times relevant, Mr. Vashone–Caruso has been in the
Colorado Department of Corrections ("CDOC")'s Arkansas
Valley Correctional Facility ("AVCF"). Mr. Vashone–
Caruso is a practitioner of the Hanafi school of Sunni Islam.
He began studying Islam in 1985, and converted in 1988.

Case: 3:13-cv-00546-bbc Document #: 29 Filed: 01/15/15 Page 8 of 22
**Caruso v. Zenon, Not Reported in F.Supp.2d (2005)**
2005 WL 5957978

In past years, he has served as an *imam*[3] at AVCF, and now serves on the council of elders which advises Muslim adherents concerning their daily affairs. He currently has minimum security status at AVCF and works as a janitor.

AVCF is a medium security prison housing approximately 1,000 inmates, of which 30% have known gang affiliations. Inmates at AVCF are housed in 58–person "pods," consisting of dry, single-occupancy cells and a common area. Inmates have keys to their own cells and are permitted to mingle in the common area of their pod at most times of day. The pod is overseen at all times by at least one corrections officer in a sealed "control room." Due to budget cutbacks affecting both CDOC in general and AVCF in particular, the facility is operated with a minimum number of security officers, and has lost some 28 positions in the past year as a result of funding cuts.

**\*2** CDOC's primary regulation governing inmate religious exercise is Administrative Regulation 800–1 ("AR 800–1"). AR 800–1 is part of a comprehensive set of regulations drafted in the early 1990s by Gerald Gasko, CDOC's former Chief of Staff and Deputy Director. Mr. Gasko testified that the regulations relating to religious exercise were enacted for the purpose of making the operations at all CDOC institutions more uniform and consistent. In addition, Mr. Gasko believed that religious exercise by inmates is an important component of CDOC's rehabilitative mission. Ar 800–1 describes its purpose as "ensur[ing] that offenders have the opportunity to participate in practices of their faith group that are deemed essential by the governing body of the faith, limited only by documentation showing threat to the ... security or good order of the facility," and that "Faith based programs/observances shall be accommodated within available time and space, unless an overriding compelling governmental interest exists."An important component of AR 800–1 is Exhibit E, entitled "Faith Group Overview." It identifies approximately 30 religious denominations that it refers to as "faith groups," and identifies, for each faith group, particular religious diet obligations and fast days; recognized holy days; personal and group worship practices; and those items of religious property that may be possessed by inmates. Mr. Gasko testified that the descriptions of religious tenets and practices in the Faith Group Overview were the result of conversations with learned advisors from each religious denomination; he was emphatic that "I was not going to make a religious decision, nor was I going to ask the Executive Director [of CDOC] to make a religious decision."

Although Mr. Gasko intended the Faith Group Overview in AR 800–1 to be a foundation establishing what type of religious activities must be accommodated by CDOC, he anticipated that CDOC would expand ways to facilitate inmate religious observance because he believed inmate religious practice lent a stabilizing effect to prison life and facilitated inmate rehabilitation. Unforetunately, Mr. Gasko's philosophy has not been adopted by subsequent administrators. For example, Albert Trujillo, the Volunteer Coordinator at AVCF, considers AR 800–1 a "ceiling"— the maximum extent to which CDOC is obligated to accommodate inmate religious exercise. Mr. Trujillo's testimony suggested that he views AR 800–1's description of faith practices as received wisdom, and that he does not believe he should have any further dialogue with advisors from the various faith groups regarding their practices. Similarly, Carl Zenon, Warden of AVCF, testified that he viewed the Faith Group Overview as a ceiling, and that he could impose restrictions on the practices listed therein.

**B. *Halal* diet claim**

Mr. Vashone–Caruso seeks access to a *halal* diet, which he contends must contain regular servings of *halal* red meat. Islamic scriptures categorically prohibit adherents from consuming certain foods, including alcohol, pork, red meat from carnivores and omnivores, carrion, birds of prey, and oils or fats from such sources. These prohibited foods are referred to as *haram*.All foods that are not *haram* are permitted, or *halal*.Adherents are also precluded from precludes eating *halal* food that has been contaminated by *haram* foods, such as through contact with *haram* food or use of utensils that have not been properly cleaned following contact with *haram* food. Red meat from herbivores, such as cattle, must be processed according to certain rules before it can be considered *halal*.Kosher meat is also considered *halal,* as the strictures governing the processing of kosher meat are at least as rigorous as the strictures governing the processing of *halal* meat. Thus, a kosher diet, to the extent it does not contain alcohol, is considered *halal*.

**\*3** CDOC facilities, including AVCF, maintain two primary meal programs. All facilities use a standard, repeating six-week menu of meals that may contain red meat, pork, poultry, fish, and so on. Simultaneously, each facility prepares an alternate vegetarian entree.[4] Administrative Regulation 1550–6.[5] The vegetarian entree option was established to accommodate both individual preferences and the practices of a number of religious groups that prohibit adherents from

eating meat at some or all times of the year. Inmates may select the regular or vegetarian meals on a meal-by-meal basis. Guided by the Faith Group Overview of AR 800–1, which states that Muslims require a "non-pork vegetarian" diet, the Defendants have refused requests by Mr. Vashone–Caruso to regularly provide him with *halal* meat, serving such meat only during two annual Muslim holidays. At all other times, to avoid *haram* foods, Muslim inmates may select the vegetarian entree.

CDOC makes specialized menus available to certain inmates on religious grounds, although the record appears to reflect that it has only done so in anticipation of or in response to a court order. Several witnesses testified regarding a prior lawsuit brought against CDOC by Jewish inmates, which resulted in CDOC being ordered to provide kosher meals. *See generally Beerheide v. Zavaras,* 286 F.3d 1179 (10th Cir.2002). Similarly, Ms. Zavislan testified that CDOC implemented a strict vegetarian (vegan) diet when faced with litigation brought by a Wiccan inmate, and also testified regarding another lawsuit, *Green v. Zavaras,* 95–S–2973, involving a request for kosher diets.

The diet issue in this case involves Mr. Vashone–Caruso's request that he be provided with a meal that regularly includes *halal* red meat. Mr. Vashone–Caruso contends that Islamic scriptures encourage adherents to consume *halal* foods, and that to fail to eat *halal* red meat is considered a sign of ingratitude towards God's provision of such food. The Defendants disagree.

Two expert witnesses addressed this issue. Amar Amonette testified that Muslims are instructed to eat a moderate diet consistent with the standards of their culture. When asked whether an essentially vegetarian diet would be *halal,* he stated that he, personally, did not know any Muslims who ate that way; and opined about a situation in which a Muslim purposefully chose not to eat *halal* meat that was available; in that circumstance, the person would be impermissibly substituting his opinion for that of God. However, at no time did Mr. Amonette directly state that the Muslim faith required a person to regularly consume *halal* red meat. Mohammed Jodeh, testified that although Islam requires adherents to eat only *halal* foods, it does not dictate that they must eat any *particular halal* food. Mr. Jodeh explained, for example, that a Muslim is free to decline to eat a particular *halal* food because he dislikes the taste of it or because the food is not readily available to him. Mr. Jodeh saw nothing un-Islamic about inmates consuming a vegetarian menu.

**\*4** Mr. Vashone–Caruso has requested that, as an alternative to a meal containing *halal* meat, he be provided with the same kosher meal that is made available to Jewish inmates. The Defendants have refused, on the grounds that the *Beerheide* order applies only to Jewish inmates, and have told Mr. Vashone–Caruso that he can obtain a kosher meal only by changing his religious preference designation to Judaism. *See e.g.* AR 1550–06, section IV.B.2 (a request for religious diet will be reviewed by the Area Volunteer Coordinator for "verification of religious affiliation").

At trial, the Defendants introduced evidence of Mr. Vashone–Caruso's canteen purchases of *haram* foods in an attempt to demonstrate that his request for a *halal* diet was insincere. The Defendants contend that the Mr. Vashone–Caruso made 113 purchases of *haram* food, including pork sausage, *non-halal* meats and poultry, and even certain nacho chips, from the canteen over a three-year period. However, the record does not necessarily support that number cited by the Defendants. Based on the testimony that all red meat that is not specifically *halal* is *haram,* Mr. Vashone–Caruso's purchases of pork products and *non-halal* beef products from the canteen would necessarily mean those items—some 30 purchases in the three-year period—are *haram.* However the Defendants' contention that purchases of certain products containing chicken or whey are also *haram* is speculative. Mr. Amonette, was never directly asked about whether chicken products might be *haram,* and Mr. Jodeh testified that chicken is *halal.* Neither witness was asked about whether whey, the allegedly offending ingredient in the nacho chips, was *haram.* Thus, on the record before it, the Court can only find that the Plaintiff made 30 purchases of *haram* foods from the canteen during the three-year period in question.

### C. Religious classes claim

The experts agreed that ongoing religious education is strongly favored in Islam. Mr. Vashone–Caruso testified that it was important for him to continually study to improve his pronunciations in Arabic—the language in which Islamic prayers are said—so as not to inadvertently render his prayers incomprehensible or even blasphemous. In addition, discussion with others about prayers and scripture help Mr. Vashone–Caruso to avoid un-Islamic behavior. Mr. Amonette confirmed that study is an important principle of Islam, and that Muslims believe that an hour of study is more valuable than an entire evening of prayer. Mr. Jodeh agreed, stating that Muslims are obligated to "seek knowledge from cradle

to grave," and that it is desirable for Muslims to study with those who are more learned in the faith.

Until 2000, Mr. Vashone–Caruso and other Muslims were able to participate in religious education classes. The precise manner in which such classes were conducted and overseen is not entirely clear from the record. According to Mr. Vashone–Caruso, these classes had been conducted daily by inmates in the AVCF Visitors Room, without direct supervision by a chaplain, volunteer, or guard, and that they were subject only to indirect supervision by a guard in the control room or a chaplain conducting another class in the same room. Mohammed Kharrubi, an *imam* formerly employed as a chaplain [6] by CDOC and who later served as a volunteer chaplain, had a different recollection. He testified that he arranged to have a corrections officer or chaplain present to supervise religious education classes, although sometimes the same officer supervised several classes simultaneously. Mr. Gasko testified both that it was within each facility's warden's discretion to permit inmates to supervise religious classes and that it would be inappropriate to rely on a control room guard to be responsible to supervise an inmate gathering, since the control room guard would not be allowed to leave to control room to respond to a situation. The classes were terminated in 2000, after budget cuts reduced the availability of chaplains to supervise classes, and no suitable Muslim community volunteers were located to lead the classes.

**\*5** Pursuant to subsection IV. *I* of AR 800–1, in situations where an inmate's faith group is not represented by a chaplain or CDOC volunteer, CDOC will assist the inmate in locating a qualified community volunteer to minister to that faith. Nevertheless, between the departure of Mr. Kharrubi and through the eve of trial in this case, CDOC made no diligent efforts to locate volunteers to lead Muslim study groups. Approximately 3% of CDOC's inmate population is Muslim. In late 2004, when Katherine Sanguinetti, CDOC's Chief of Community Resources, testified at deposition that of CDOC's 1,900 volunteers, only three were tasked with providing religious assistance to Muslim inmates. Ms. Sanguinetti then testified that she spent 10% of her work time recruiting volunteers, but that he specific efforts to recruit Muslim volunteers consumed only 1 percent of that 10 percent figure (that is, .001% of her time). [7] As of that time, Ms. Sanguinetti had not personally met with anyone to seek Muslim volunteers, although she had met with organizations representing Jewish, Christian, Wiccan, and Native American faiths.

But after giving her deposition Ms. Sanguinetti's efforts on behalf of Muslim inmates increased significantly. She joined the American Academy of Religions; consulted with a local Muslim volunteer, Mark Favors, regarding the issues in this case; and sent an increased number of letters to Muslim groups seeking volunteers, as well as recruited an additional three Muslim volunteers. As a result, including Mr. Favors, she recruited three additional Muslim volunteers in the span of a few months. Ms. Sanguinetti denied that her increased activity in seeking Muslim volunteers and consulting on Muslim issues was prompted by the impending trial in this action. However, the Court observes that this increased activity began only after her deposition, occurred closely in time to the trial, and stands in sharp contrast with relative inaction during the previous four years. Ms. Sanguinetti laid much of the credit for her recent breakthroughs in gaining Muslim volunteers to joining the American Academy of Religions, but acknowledged that she could have joined that group years ago.

Mr. Vashone–Caruso requestes that the Court direct the Defendants to restore weekly religious education classes, led by Muslim volunteers, under the supervision of a either a volunteer chaplain or the control room guard. Mr. Vashone–Caruso expressly stated that classes composed entirely of and led by inmates was not sufficient, as "We can hear ourselves talk everyday of the week. We don't need to hear ourselves talk."In his closing brief, Mr. Vashone–Caruso disclaims any request to conduct unsupervised religious education classes, and merely requests that classes be supervised in the same manner as other religious education classes presently are.

At the time of trial, AVCF was providing and Mr. Vashone–Caruso was attending monthly religious education classes supervised by Mr. Favors Mr. Favors had begun holding the classes in December 2004, although classes in January and February 2005 were not held for reasons not stated in the record. Mr. Vashone–Caruso appears to concede that the classes led by Mr. Favors meet all of his requests, with the exception that he desires weekly, rather than monthly, classes.

**D. *Kufi* claim**

**\*6** Mr. Vashone–Caruso's final claim involves his ability to wear a distinctive skullcap, called a *kufi,* while outside his cell. According to Mr. Vashone–Caruso, the Hanafi school of Islam requires that adherents cover their heads when leaving their homes or place of work, or when engaging in worship services. He explained that the *kufi*"is a continuous reminder of our religious obligations ... and when you're wearing this

*kufi* on your head it would be very, very inappropriate and unacceptable to engage in some conduct that was contrary to Islam."It was not clear whether the Mr. Vashone–Caruso contended that a *kufi* in particular was necessary to serve as such a reminder, or whether any headcovering served the same purpose. However, Mr. Vashone–Caruso also stated that the *kufi*"identifies your faith. It identifies who you are."When asked if he could substitute some other form of state-issued headgear for the *kufi,* he objected, stating that wearing "brimmed hats or billed hats or neckties, stuff like that, it's forbidden."When asked to identify the scriptural passages that dictated the wearing of a *kufi,* Mr. Vashone–Caruso recited a passage in which it was observed that the Prophet Mohammed "never appeared anywhere outside of his bedroom with his head uncovered."However, Mr. Vashone–Caruso acknowledged that the passage did not specifically require that a head covering be a *kufi* as opposed to some other item.

Mr. Amonette, elaborated on the significance of the *kufi.*He explained that it is customary throughout the Islamic world for men to wear head coverings, although the precise nature of that covering could vary by location and societal tradition. However, he testified that in the Hanafi school of Islam, *kufis* are required to be worn by adherents. Mr. Amonette acknowledged that brimless headcoverings [8] could serve the requirement of covering an adherent's head while permitting prayer, but he noted that Islam encourages its adherents to adopt garments "of an Islamic character," so as not to be associated with members of other communities. Mr. Jodeh, denied that Islam requires adherents to cover their heads, and stated that the matter was more one of cultural preference than religious edict. He stated that no particular form of headgear was compelled, and for Muslims who chose to wear a head covering, the precise type of covering was a matter of personal and cultural choice. Mr. Jodeh acknowledged that he had to consult with another individual regarding the requirements of the Hanafi school of Islam, and that it was this individual's opinion that the Hanafi school does not require *kufis.*However, Mr. Jodeh acknowledged that he could not say whether Mr. Amonette's opinion on the matter was right or wrong.

During Mr. Gasko and Mr. Kharrubi's tenure with CDOC, Muslim inmates were allowed to wear *kufis* at all times. Although Mr. Gasko raised concern about *kufis* being used to demonstrate gang affiliation, the concern was alleviated by restricting inmates to wearing only white *kufis.*No security problems were reported relating specifically to

*kufis,* but according to Mr. Gasko, in late 1999, the policy regarding religious headwear was changed in response to concerns raised by wardens that "headgear of any sort was identifying inmates and was becoming a safety hazard."The change in policy regarding headgear applied to all faiths, notwithstanding the fact that inmates wearing *kufis* in particular had not caused any problems.

**\*7** At present, under AR 800–1, section IV.P.7 provides that personal faith property items, such as *kufis,*"shall be worn, displayed, or used only in the offender's cell, or during authorized faith group programs. Personal faith property items shall not be worn, displayed, or used in general population, or while (sic) to and from faith group program areas within the facility."This policy permits Mr. Vashone–Caruso to wear a *kufi* while in his cell or during Muslim religious services, but does not permit him to wear a *kufi,* for example, while mingling in the common area of the pod or while engaging in recreation in the outdoor yard.

According to Ms. Sanguinetti, each inmate is issued a stocking cap and a baseball cap, and may wear these state-issued items at any time. Inmates can also purchase "do rags" from the canteen. Ms. Sanguinetti's testimony appeared to be that a "do rag" can be worn in the inmate's housing unit—apparently including the common area of the pod—but not in general population, which the Court understands to refer to activities such as recreation time in the outdoor yard.

## *ANALYSIS*

### *1. Pending Motions*

On the eve of trial, the Defendants filed two written motions to dismiss (# 271, 273), and during trial, raised several additional oral motions. The Court will address these motions in turn.

#### a. Motion to Dismiss on Immunity Grounds

The Defendants moved to dismiss the Plaintiff's state law claim of religious discrimination on Eleventh Amendment Immunity grounds **(# 271).** The Plaintiff withdrew that claim at the beginning of the trial, rendering the motion moot.

#### b. Motion to Dismiss on Exhaustion Grounds

The Defendants also moved to dismiss Mr. Vashone–Caruso's claims for failure to exhaust as required by the Prisoner Litigation Reform Act, 42 U.S.C. § 1997e(a)**(# 273).**

Exhaustion is neither a jurisdictional requirement nor an affirmative defense subject to waiver; rather, it is an essential element of the claim that must be pleaded in the Complaint. *Steele v. Federal Bureau of Prisons,* 355 F.3d 1204, 1209– 10 (10th Cir.2003). The requirement is mandatory, *see e.g. Beaudry v. Corrections Corp. of America,* 331 F.3d 1164, 1167 n. 5 (10th Cir.2003), and may not be excused by the Court because, for example, the Defendants inexplicably waited nearly a decade after the filing of the Complaint to raise it.

However, the Prisoner Litigation Reform Act ("PLRA") was enacted on April 26, 1996, P.L. 104–134, almost a full year after this action was commenced. Although the 10th Circuit does not appear to have addressed the effect of the enactment of the PLRA on then-pending litigation, other circuits have declined to apply the exhaustion requirement to cases commenced prior to the PLRA's enactment unless the complaint was amended subsequent to the PLRA in a manner that does not related back to the original pleading pursuant to Fed.R.Civ.P. 15(c).*See Scott v. Coughlin,* 344 F .3d 282, 291 (2d Cir.2003); *Foulk v. Charrier,* 262 F.3d 687, 696 (8th Cir.2001); *Bishop v. Lewis,* 155 F.3d 1094, 1096 (9th Cir.1998).

**\*8** The Defendants have argued that Mr. Vashone–Caruso's post-PLRA Amended Complaint **(# 175),** filed on March 17, 2004, triggered the exhaustion requirement. Ordinarily, an amended pleading relates back to the earlier pleading if the amended claim arises out of the same conduct or transaction giving rise to the original pleading. Fed.R.Civ.P. 15(c)(2). Relation back focuses on the similarity of facts asserted in the original and amended pleading, and an amendment will relate back despite clarifying prior factual assertions or interposing new legal theories based on previously alleged facts. *See e.g. Sivulich–Boddy v. Clearfield City,* 365 F.Supp.2d 1174 (D.Utah 2005), *citing F.D.I.C. v. Conner,* 20 F.3d 1376, 1385–86 (5th Cir.1994). Here, the original Complaint (# 3), filed some 10 years ago, alleged several deprivations of religious liberty, including precisely the same conduct that is currently under consideration: the denial of a *halal* diet, *see Docket* # 3 at ¶ 21(b); undue limitation of the right to wear a *kufi, id* . at ¶ 21(i); and denial of religious education classes, *id.* at ¶ 21(c). [9] Under these circumstances, Mr. Vashone– Caruso's subsequent amendment of the Complaint to clarify the allegations relating to these alleged deprivations or the statute upon which his claims are asserted does not prevent the amendment from relating back to the original, pre-PLRA

Complaint, and thus, Mr. Vashone–Caruso's duty to exhaust is not triggered.

**c. Defendants' oral motions at trial**

The Defendants made several oral motions at trial. The first sought to preclude the testimony of Mohammed Kharrubi who, at the time of trial, was residing in the United Arab Emirates. Mr. Kharrubi's testimony was presented by telephone, over the objection of the Defendants, who argued that Mr. Vashone–Caruso had not secured effective means to administer an oath to Mr. Kharrubi prior to his testimony. Fed.R.Civ.P. 43(a) provides that the Court may, "for good cause shown and in compelling circumstances and upon appropriate safeguards, permit presentation of testimony in open court by contemporaneous transmission from a different location."As the Court understands, the Defendants do not dispute that there were sufficiently compelling circumstances and good cause to warrant taking Mr. Kharrubi's testimony remotely from the United Arab Emirates. Their only objection was to whether sufficient safeguards were in place with regard to his testimony.

There is little case authority that explores the nature of safeguards necessary to allow remote testimony under Rule 43. *F.T .C. v. Swedish Match North America,* 197F.R.D. 1, 2(D.D.C.2000) suggests, with some degree of persuasiveness, that the essential safeguards are that the testimony is received in open court, is given under oath, and that the witness be subject to cross-examination. *Citing Beltran–Tirado v. INS,* 213 F.3d 1179 (9th Cir.2000). Here, Mr. Kharrubi's testimony was received in open court, and he was subject to full cross-examination by the Defendants. The primary area of dispute concerns whether Mr. Kharrubi's testimony was given under oath.

**\*9** Although Mr. Vashone–Caruso secured the assistance of an American lawyer admitted to the various federal District Courts of Florida to affirmatively identify Mr. Kharrubi, it is undisputed that neither this lawyer, nor the Court's courtroom deputy who administered an oath to Mr. Kharrubi, are qualified under the law of the United Arab Emirates to do so. However, the Court notes that Fed.R.Civ.P. 42(d) provides that a witness' affirmation is a suitable substitute for a sworn oath. All that is necessary is that the witness be impressed with the duty to tell the truth and understands that he or she can be prosecuted for perjury for failure to do so. *See Gordon v. State of Idaho,* 778 F.2d 1397, 1400 (9th Cir.1985). Mr. Kharrubi was sworn by the courtroom deputy using precisely the same oath that is given to witnesses testifying in person,

and Mr. Kharrubi affirmed his willingness to abide by that oath. Thus, regardless of whether the oath was binding on Mr. Kharrubi under the laws of the United Arab Emirates, his affirmation is sufficient to substitute for a sworn oath under Rule 42(d). Accordingly, the Court finds that Mr. Kharrubi's testimony was accompanied by sufficient safeguards under Fed.R.Civ.P. 43.

Finally, at the close of Mr. Vashone–Caruso's case, the Defendants moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 52. The Court deferred ruling on the motion at the time, and proceeded to hear the remainder of the evidence. Having had the opportunity to study the record as it existed at the close of Mr. Vashone–Caruso's case, the Court finds sufficient evidence to establish a *prima facie* case on each of Mr. Vashone–Caruso's claims. Accordingly, the Defendants' oral Rule 52 motion is denied.

**d. Mr. Vashone–Caruso's oral motion**

In their Rule 52 motion, the Defendants pointed out that the evidence established that only the Executive Director of CDOC, not any of the Defendants, were capable of changing established regulations. In response, Mr. Vashone–Caruso made an oral motion to amend the Complaint to name the Executive Director of CDOC as a party in his official capacity. The Defendants opposed this request as untimely, and the Court reserved ruling on it.

Although the Defendants are correct that Mr. Vashone–Caruso never previously sought to expressly name the Executive Director, despite having nearly a decade to do so, the Executive Director was effectively named as a party throughout this proceeding by operation of law. Since the inception of this action, Mr. Vashone–Caruso asserted claims against various CDOC officials "in their official capacities." Official capacity suits are merely an alternative way of pleading a claim against the entity for which the official named is an agent.*Hafer v. Melo,* 502 U.S. 21, 25 (1991), *citing Kentucky v. Graham,* 473 U.S. 159, 165 (1985). As long as the entity receives notice and an opportunity to respond, an official capacity suit is, in all respects other than name, to be treated as a suit directly against the entity. *Graham,* 473 U.S. at 166.Although it may be tidier to name the Executive Director of CDOC as a party, failure to do so is not a basis for dismissal of Mr. Vashone–Caruso's claims. Amendment to name the Executive Director in an official capacity would be the functional equivalent of directly naming CDOC itself as the party, and, by naming Defendants Sanguinetti and Zavislan—agents acting on behalf of CDOC

—as parties in their official capacities, Mr. Vashone–Caruso has already effectively made CDOC the real party in interest. Accordingly, Mr. Vashone–Caruso's oral motion to amend the Complaint is denied as moot.

**2. Standard of review**

**a. Elements of the RLUIPA claim**

**\*10** Mr. Vashone–Caruso asserts claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-l(a) *et seq.* That statute provides that

> no government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person [ ] is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest.

*Id.* To establish a *prima facie* claim under RLUIPA, a plaintiff must show: (i) that he wishes to undertake some form religious exercise; (ii) that the religious belief underlying the desired exercise is sincere; and (iii) that the Defendants have imposed a "substantial burden" on that exercise. *See e.g. Grace United Methodist Church v. City of Cheyenne,* 235 F.Supp.2d 1186, 1195–96 (D.Wyo.2002). The burden then shifts to the defendant to demonstrate that the regulation burdening the religious exercise; (i) furthers a compelling governmental interest; and (ii) is the least restrictive means of achieving that interest. *Id.*

To establish that a governmental interest is compelling, a defendant must do more than simply assert a governmental interest in obtaining some result; rather, it must show strong evidence of a harm it seeks to remedy. *Miller v. Johnson,* 515 U.S. 900, 922 (1995); *Murphy v. Missouri Department of Corrections,* 372 F.3d 979, 989 (8th Cir.2004) ("to satisfy RLUIPA's higher standard of review, prison authorities must provide some basis for their concern that racial violence will result from any accommodation of CSC's request").

**b. Constitutionality of RLUIPA**

Caruso v. Zenon, Not Reported in F.Supp.2d (2005)

2005 WL 5957978

The Defendants have moved to dismiss Mr. Vashone–Caruso's RLUIPA claim on the grounds that RLUIPA is facially unconstitutional, insofar as it violates the Establishment Clause; exceeds Congress' power under the Taxing and Spending Clause and the Commerce Clause; violates the Tenth Amendment; and violates the doctrine of Separation of Powers (# 179). The Court deferred ruling on the Defendants' Motion to Dismiss, pending a ruling from the Supreme Court on the Establishment Clause issue in *Cutter v. Wilkinson, cert. granted,* 125 S.Ct. 308 (2004). On May 31, 2005, the Supreme Court ruled in *Cutter,* finding that RLUIPA does not violate the Establishment Clause. *Cutter v. Wilkinson,* 125 S.Ct. 2113 (May 31, 2005). Thus, the Defendants' Motion to Dismiss on Establishment Clause grounds is denied.

As for the Defendants' remaining arguments for unconstitutionality, they have not been addressed by either the Supreme Court or 10th Circuit. Other courts, however, have uniformly found RLUIPA constitutional over such objections. *See e.g. Benning v. Georgia,* 391 F.3d 1299, 1305–1309 (11th Cir.2004) (RLUIPA is valid exercise of Congress' spending power and does not violate 10th Amendment); *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1242 (11th Cir.2004) (rejecting 10th Amendment argument); *Charles v. Verhagen,* 348 F.3d 601, 606–11 (7th Cir.2003) (rejecting Spending Clause and 10th Amendment challenges); *Mayweather v. Newland,* 314 F.3d 1062, 1066–1070 (9th Cir.2002) (rejecting Spending Clause, 10th Amendment, and Separation of Powers challenges). Here, the Defendants merely iterate the same arguments considered and rejected by such courts, without addressing the thoughtful reasoning of these opinions. This Court sees no persuasive reason to come to a result contrary to the considered opinions of every circuit court to have considered the issue. Accordingly, the Defendant's Motion to Dismiss (# 179) the RLUIPA claims is denied and the Court finds that RLUIPA is constitutional.

**c. Elements of the Equal Protection claim**

**\*11** Mr. Vashone–Caruso also asserts an Equal Protection claim. To prove that the Defendants violated his right to Equal Protection, Mr. Vashone–Caruso must show that the Defendants treated similarly-situated groups differently, and that the differential treatment was motivated by impermissible consideration of his religion. *See Marshall v. Columbia Lea Regional Hospital,* 345 F .3d 1157, 1179 (10th Cir.2003).

*3. Halal diet*

**a. Under RLUIPA**

*(i). Mr. Vashone–Caruso's prima facie case*

The Defendants contend that Mr. Vashone–Caruso's professed desire to maintain a diet containing *halal* meat is insincere. They point to his various canteen purchases of meat products and other foods that are *haram.*Whether religious beliefs are sincerely held is a question of fact. *Mosier v. Maynard,* 937 F.2d 1521, 1526 (10th Cir.1991). A belief is sincere if it is religious in nature and truly held by the adherent. *Id.*

The Court is satisfied that Mr. Vashone–Caruso's religious beliefs, including his belief that he must avoid *haram* foods, are sincere. It is effectively undisputed that Mr. Vashone–Caruso purchased *haram* foods from the canteen on some 30 occasions over a three-year period. At the same time, it is also undisputed that Mr. Vashone–Caruso has been a longtime adherent of the Muslim faith, and has risen to the level of *imam.*He may have strayed from the teachings of his faith—even repeatedly—with regard to his purchase of *haram* foods. These purchases demonstrate carelessness at best, and spiritual weakness at worst, but they do not suggest that his intent to adhere to Islamic law or a *halal* diet is somehow insincere. The Court finds no evidence to suggest that Mr. Vashone–Caruso's request for a *halal* diet is made for the purpose of harassing the Defendants or is interposed for anything other than a genuine desire by Mr. Vashone–Caruso to observe more closely the teachings of his faith. *See generally Reed v. Faulkner,* 842 F.2d 960, 963 (7th Cir.1988).

The Defendants also contest whether Mr. Vashone–Caruso's desire to consume *halal* red meat constitutes a protected religious exercise. The parties devoted substantial energy to arguing whether regular consumption of red meat was required in a *halal* diet by the tenets of Islam, or whether such consumption was merely optional, such that a vegetarian diet is a sufficient alternative. However, these arguments miss the mark. RLUIPA is not limited to religious practices mandated by the faith's doctrine. 42 U.S.C. § 2000cc–5(7) (A); *Kikumura v. Hurley,* 242 F.3d 950, 960 (10th Cir.2001). So long as a practice is a form of exercising his religion, Mr. Vashone–Caruso's desire to regularly consume *halal* red meat is an act protected under RLUIPA regardless of whether it is a mandatory or optional practice of Islam. On this point, both Islamic experts agree; under Islam, the act of eating any *halal* food, including red meat, is considered an act of thanks

and worship. Moreover, it is clear from his testimony that Mr. Vashone–Caruso intends it as such. Because consuming *halal* red meat (or fish, or strawberries, or any other *halal* food God has provided) is one way in which Muslims may exercise their religious beliefs, the court finds that Mr. Vashone–Caruso's desire to regularly consume *halal* red meat is a form of religious exercise protected under RLUIPA.

**\*12** Next, the Court turns to the question of whether the religious exercise of eating *halal* red meat is "substantially burdened" by CDOC's regulations. There can be little doubt that it is. The undisputed testimony is that Muslim inmates are provided with *halal* red meat twice per year on Islamic holy days. At all other times, Mr. Vashone–Caruso is only able to consume *halal* red meat by obtaining it from the prison canteen at his own expense. This is not a sufficient alternative for an inmate of limited means. *See e.g. Berrheide,* 286 F.3d at 1187.Under these circumstances, Mr. Vashone–Caruso's ability to engage in the religious exercise of consuming *halal* red meat is substantially burdened by CDOC's food service policies. This is sufficient for Mr. Vashone–Caruso to state a *prima facie* claim under RLUIPA.

### *(ii). The Defendants' burden*

In the face of these findings, the Defendants have the burden to show that their policies serve a compelling government interest by the least restrictive means.

Unfortunately, neither their evidence nor the Defendants' closing brief expressly identify the particular governmental interests that would compel the exclusion of *halal* red meat from Mr. Vashone–Caruso's diet. In the section of the Defendants' closing brief addressing the application of the analytical framework of *Turner v. Safley,* 482 U.S. 78, 89 (1987), however, the Defendants argue that CDOC's dietary policies of serving vegetarian meals in order to satisfy the needs of Muslim inmates serve the following governmental purposes: (i) meeting budgetary concerns; (ii) promoting uniformity between facilities; (iii) simplifying meal preparation; (iv) "balanc[ing] the load on the available equipment and staff in the prison kitchens"; and (v) promoting security by preventing inmates from becoming identified based on their religion. The Court will assume that the Defendants assert that these justifications are "compelling" for purposes of RLUIPA.

Turning to the proffered justification, budgetary concerns, there was no direct evidence of the current actual costs of regularly providing *halal* meat (or, as Mr. Vashone–Caruso

has requested, the existing kosher meal). The only evidence of costs of providing *halal* or kosher meals is Exhibit 35, a 9–year old letter from Ms. Zavislan to Mr. Gasko, dated April 1996, which estimated the cost of kosher or *halal* meals to be \$ 4,928 per inmate annually, compared to \$ 968 per inmate annually for the cost of the regular and vegetarian meals. This evidence is of limited probative value for several reasons. First, it is based on costs as of 1996, rather than current costs. Given the significant age of this information, the Court declines to speculate as to what degree current costs could be extrapolated from this data.

Second, it reflects Ms. Zavislan's *projections* as to the costs of providing kosher (and, by extension, *halal* ) meals. CDOC has now been providing kosher meals to Jewish inmates for over five years, pursuant to *Beerheide v. Suthers,* 82 F.Supp.2d 1190 (D.Colo.2000). CDOC's *actual* costs for providing such meals are ascertainable, and would be more persuasive than preliminary *estimates* of such costs. Importantly, Ms. Zavislan's 1996 estimates do not reflect the way CDOC actually implemented the kosher meal program. The estimated annual cost of \$4,928 per inmate appears to be based on the cost of separately purchasing all elements of kosher meals, including kosher breads, cereals, condiments, beverages, soups, desserts, etc., as well as disposable plates, bowls, and utensils, plus "labor costs," presumably reflecting preparation of kosher meals by prison staff. This is not how kosher meals have actually been prepared, however. Ms. Zavislan testified that, in practice, kosher meals consist of pre-packaged entrees ordered from kosher suppliers that are warmed up in a microwave. More than half of the food items used to create kosher meals are drawn from CDOC's regular supplies, and presumably represent little additional cost in labor.

**\*13** Third, neither side purported to offer Exhibit 35 as substantive proof of the current costs of providing kosher or *halal* meals. The document was offered by Mr. Vashone–Caruso during direct examination of Ms. Zavislan, during a discussion of positions taken by CDOC and Ms. Zavislan during the *Beerheide* case. All of the colloquy regarding Exhibit 35 was conducted in the past tense, referring to the 1996 timeframe, and at no time during the trial did Ms. Zavislan (or anyone else) testify that CDOC considered Exhibit 35 had any contemporary relevance. To the contrary, Ms. Zavislan recognized that Exhibit 35 does not reflect present circumstances. When asked if the document contained a "combined estimate of the cost to provide kosher and

**Caruso v. Zenon, Not Reported in F.Supp.2d (2005)**

2005 WL 5957978

*halal* diets," Ms. Zavislan responded that "That was our understanding *at that time*." (Emphasis added.)

Accordingly, the Court finds that the record contains no persuasive evidence as to the additional cost—if any—of providing a diet containing kosher or *halal* meat to Mr. Vashone–Caruso. Without such evidence, the Court cannot consider whether any disparity between the cost of the regular meal and the cost of a meal containing kosher or *halal* meat amounts to a compelling justification for the Defendants' policy of refusing to provide such a meal.

The next justification urged by the Defendants is uniformity among prison facilities. This was discussed generally by Ms. Zavislan, who testified that CDOC employs two registered dieticians to review each day's menu and ensure that it is nutritionally adequate. Having a uniform meal policy among facilities reduces the need for multiple instances of nutritional analysis. Ms. Zavislan also testified that a uniform meal policy makes it possible to streamline CDOC's purchase and storage of foodstuffs, insofar as all facilities will use the same items. In addition, using the same menu at all facilities reduces the number of complaints when inmates are transferred from one facility to another, and minimizes the need for special training in the handling and preparation of numerous specialized diets.

This argument might be persuasive had CDOC not already implemented a number of specialized meal programs. In addition to the regular and vegetarian meals, the evidence indicated that CDOC regularly prepares kosher meals, vegan meals, and certain "specialized vegetarian" meals. Thus, it would appear that there is already minimal uniformity to be preserved with regard to nutritional analysis and special training. Moreover, there was no evidence suggesting that accommodating Mr. Vashone–Caruso through his alternative request for a kosher meal would compromise any of these uniformity concerns, given that CDOC already deals with the additional purchasing and training obligations the existing kosher meal program entails. Thus, the Defendants have not established that uniformity is a compelling justification for the policy under RLUIPA.

**\*14** The next justification urged by the Defendants is simplifying preparation. As with the justification of uniformity, Ms. Zavislan testified that having a limited number of different meals makes it easier to train and supervise inmates responsible for preparing those meals. Ms. Zavislan testified that as the number of types of specialized

meals increases, the number of staff needed to prepare and serve those meals increases, and the risk of errors leading to meal contamination rises. Once again, however, this justification lost any persuasive value once CDOC implemented the kosher meal program. There is no evidence to suggest that extending the existing kosher meal program to non-Jewish inmates such as Mr. Vashone–Caruso would increase the complexity of the food service program at all.

Similarly, the Defendants argued that having limited varieties of meals "balance[s] the load on equipment and staff."The argument is unpersuasive for the same reasons. There is no evidence that extending the kosher meal plan to Mr. Vashone–Caruso would require any material change in current operations. Indeed, the Defendants have previously offered to extend the kosher meal to Mr. Vashone–Caruso if he would only change his designated religious affiliation. This suggests that the refusal to provide kosher meals to Mr. Vashone–Caruso is not the result of any concerns by CDOC about budgets or uniformity or simplicity or burdens placed on equipment and staff, but merely on the form his request has taken.

Finally, the Defendants contend that having limited meal choices promotes security by preventing inmates from identifying others based on their meal choices. The Court has carefully reviewed the record and failed to locate any evidence correlating meal choices with inmate identity, much less linking such a correlation to security concerns. Although the Defendants cite to testimony by Katherine Sanguinetti about harassment of a Jewish inmate, the record reflects that that harassment was based on that inmate's wearing of a yarmulke, not because of the inmate's meal. The Defendants' professed concern regarding identification of inmates based on their food is not only speculative, but is belied by current CDOC policy. CDOC currently provides special kosher meals for Jewish inmates, rendering those inmates susceptible to being "singled out" by virtue of their meal. However, no witness testified that any adverse consequences had resulted from providing kosher meals to specific inmates.

As noted, the Defendants have failed to prove any compelling justification for the denial of *halal* or kosher meals to Mr. Vashone–Caruso under RLUIPA. Because the Defendants bear the burden of proving such a justification, Mr. Vashone–Caruso prevails on his diet claim under RLUIPA.

Although the Court need not consider the issue of less-restrictive means, in the interest of completeness, the Court

will briefly examine the evidence in the record on this issue. It is undisputed that Mr. Vashone–Caruso's religious exercise of regularly consuming *halal* meat is satisfied by making the existing kosher meal program available to him. Providing the kosher meal to Mr. Vashone–Caruso would be a less-restrictive means of accommodating his religious exercise of consuming *halal* red meat than the present policy of denying him access to red meat on all but two days per year. The Defendants have no argument as to why this accommodation cannot be implemented; indeed, a kosher meal is already available to Jewish inmates at AVCF The record does not reflect any additional burdens that would be placed on CDOC's staff or equipment to make a kosher meal available to Mr. Vashone–Caruso as well. *Compare, e.g., Williams v. Morton,* 343 F.3d 212, 217–18 (3d Cir.2002) (evidence established that importing additional *halal* meals would require guards to spend more time x-raying each imported meal). As stated previously, there is no reliable evidence that providing a kosher meal would actually result in any increased costs. *Id.* at 218 (plaintiffs conceded that *halal* meal would cost more per inmate than vegetarian meal). Thus, the Court must conclude that the Defendants have failed to carry their burden of showing that Mr. Vashone–Caruso's religious exercise could not be accommodated by a less-restrictive means.

**\*15** Accordingly, Mr. Vashone–Caruso is entitled to judgment under RLUIPA with regard to his *halal* diet claim.

#### b. Under Equal Protection

Mr. Vashone–Caruso also contends that CDOC's providing kosher meals to Jewish inmates while denying him access to the same meals violates his Equal Protection rights. The Court agrees.

It is Mr. Vashone–Caruso's burden to prove that, as a Muslim, he is similarly situated to Jewish inmates for purposes of having access to kosher meals. Both groups seek a specialized meal plan in furtherance of their religious beliefs. This specialized meal plan requires, at a minimum, that meat be slaughtered under certain specific conditions, and that contamination by improper foodstuffs be prevented. The Defendants argue that Mr. Vashone–Caruso (and Islamic inmates in general) are not similarly-situated to Jewish inmates for several reasons. They correctly note that Jewish rules governing the preparation of kosher meals are more stringent than Islamic rules regarding *halal* meals, in that kosher laws require not only specified practices in slaughtering animals, but also the segregation of meat and

dairy items, rigorous separation of the implements used to prepare meat and dairy items, and a prohibit serving hot foods on Saturdays. The Defendants also observe that foods containing alcohol are considered *haram,* whereas no such restriction exists for kosher meals. [10]

Although, as a Muslim, Mr. Vashone–Caruso is not *identically* situated to Jewish inmates, but that does not mean that Mr. Vashone–Caruso and Jewish inmates are not *similarly* situated with regard to the provision of kosher meals. A kosher meal serves the same purpose for both groups: it provides a well-balanced diet that conforms both groups' religious strictures. Where two distinct religious groups can have their nutritional and spiritual needs satisfied by the same meal, the Court finds that those groups are similarly situated for purposes of the Equal Protection clause. It is undisputed that Islamic inmates, including Mr. Vashone–Caruso, are not permitted to receive the kosher meal. Thus, they are indisputably treated differently from similarly-situated Jewish inmates.

The remaining question is whether this differing treatment is motivated by discrimination. In this regard, the Court observes that purposeful, invidious discrimination is not required to establish a violation of Equal Protection. Generally, it is sufficient for a plaintiff to show that the stated reasons for the differential treatment are "so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational."*See e.g. Kimel v. Florida Board of Regents,* 528 U.S. 62, 84 (2000). However, where a challenged regulation advances the interests of one religious group over another group, the Court must apply strict scrutiny and require that the regulation be narrowly tailored to advance a compelling governmental interest. *See Larson v. Valente,* 456 U.S. 228, 246 (1982).

**\*16** Here, the Defendants' practice regarding kosher meals confers a benefit to Jewish inmates, in that their religious beliefs are specifically accommodated while the same benefit is denied to Muslim inmates such as Mr. Vashone–Caruso. Indeed, Mr, Vashone–Caruso was that told he could obtain access to a kosher meal only by registering his religion as Judaism. This sectarian preference afforded to Jewish adherents requires the Court to apply strict scrutiny in reviewing the Defendants' policy.

For the same reasons discussed with regard to the RLUIPA claim, the Defendants have failed to present any evidence

of a compelling governmental interest that is served by providing Jewish inmates with kosher meals while denying the same meal to Muslims. The purportedly compelling interests proffered by the Defendants on the RLUIPA claim are equally unpersuasive in this context. The need for uniform menus and the burdens on staff from preparing multiple diets are irrelevant, as CDOC is already preparing separate kosher meals. To the extent that the Defendants feared that inmates could be "singled out" based on their meals, providing kosher meals to both Jewish and Muslim inmates would actually reduce this risk. There is no evidence to suggest that limiting kosher meals to Jewish inmates serves any compelling governmental interest, other than arguably reducing costs. However, as discussed previously, the Court does not find a hypothetical, nine-year old economic analysis sufficiently compelling [11] to justify discrimination between Jewish and Muslim inmates.

Accordingly, Mr. Vashone–Caruso is entitled to judgment on his Equal Protection claim relating to diet.

### 4. Religious education classes

#### a. Under RLUIPA

##### (i) Mr. Vashone–Caruso's prima facie case

With regard to Mr. Vashone–Caruso's request for weekly religious education classes, the first issue is whether religious education classes constitute a "religious exercise." The Defendants contend that attendance at religious education classes is not a tenet of the Islamic faith, and that the injunction that adherents continuously study can be equally satisfied by private study as well as group study. The Court is not aware of any cases that have sought to define the term "religious exercise" as used in RLUIPA beyond the statutory reference that a religious exercise includes acts both compelled by a faith and voluntary exercises of that faith. However, the Defendants' brief cites to *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995), a case under the Religious Freedom Restoration Act, for the proposition that a "substantial burden" on religious exercise occurs when the Government "inhibit[s] or constraint[s] conduct or expression that manifests some central tenet of a prisoner's individual beliefs; ... curtail[s] a prisoner's ability to express adherence to his or her faith; or [denies] a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion."From this, the Court discerns that RLUIPA's term "religious exercise" can be defined as "expressing a central tenet of belief, expressing

adherence, or engaging in an activity fundamental to the religion."

**\*17** Using this definition, the Court finds that religious education classes are a form of "religious exercise" protected by RLUIPA. Both experts agree that seeking knowledge of the faith is a fundamental element of Islam, and thus, Mr. Vashone–Caruso's efforts to seek such knowledge through the form of study classes are an effort to pursue that fundamental practice. Although Mr. Jodeh may be correct that a Muslim can fulfill his duty to educate himself by engaging in solely individual study, and thus, that collective classes are not absolutely required by the faith, this is not dispositive. Again, RLUIPA protection extends beyond those exercises that are affirmatively compelled by the faith, and reaches forms of religious exercise which an adherent may opt to practice.

The Court must then determine whether CDOC's policies "substantially burden" Mr. Vashone–Caruso's ability to engage in group study. In doing so, the Court is mindful that Mr, Vashone–Caruso seeks only prospective relief. This focuses the inquiry on Mr. Vashone–Caruso's current exercise, rather than privileges or restrictions that may have existed in the past. Likely, the Court would have found that the complete absence of educational classes—as had occurred over the past 5 years—substantially burdened Mr. Vashone–Caruso's exercise of his religion. However, this burden has been largely abated. Mr. Vashone–Caruso's current complaint about Mr. Favors' classes is that he would prefer weekly classes rather than monthly classes. A burden on religious exercise is "substantial" under RLUIPA if it denies Mr. Vashone–Caruso "reasonable opportunities" to engage in a religious exercise such as group study. *See e.g. Murphy v. Missouri Dept. of Corrections,* 372 F.3d 979, 988 (8th Cir.2004). Upon this record and in light of the expert testimony, the Court cannot find that monthly classes present an unreasonably limit on Mr. Vashone–Caruso's religious exercise.

#### b. Under Equal Protection

Mr. Vashone–Caruso's Equal Protection claim with regard to religious education classes is given only perfunctory discussion in his closing brief. Mr. Vashone–Caruso merely observes that the only Muslim study class at AVCF was cancelled in favor of allowing the facility's chaplain to continue supervising a Protestant bible-study class, and that weekly Muslim religious classes at AVCF are denied although weekly classes are allegedly held for Jehovah's Witnesses, Buddhists, and other religions.

Case: 3:13-cv-00546-bbc Document #: 29 Filed: 01/15/15 Page 19 of 22
**Caruso v. Zenon, Not Reported in F.Supp.2d (2005)**
2005 WL 5957978

Again, the Court considers the Equal Protection claim mindful of the fact that only prospective relief is sought. Thus, AVCF's past cancellation of Muslim study classes in favor of other religions is irrelevant. The only question to be decided is whether Mr. Vashone–Caruso can show that, on a current and ongoing basis, CDOC is treating similarly-situated groups differently without adequate justification.

In this regard, Mr. Vashone–Caruso contends that he is similarly-situated to inmate adherents of Jehovah's Witnesses, Buddhists, and other religions that enjoy weekly religious education classes. But except for the mere assertion that adherents of these other religions attend classes on a weekly basis, Mr. Vashone–Caruso has not presented any evidence to demonstrate that he, as a Muslim, is similarly-situated to adherents of such faiths. There is no evidence as to whether group study is a central tenet of these religions, such that AR 800–1 compels CDOC to conduct the classes, nor whether the availability of volunteers for these religions is similar to the availability of Muslim volunteers. Accordingly, Mr. Vashone–Caruso has failed to carry his burden of showing dissimilar treatment, and thus, his Equal Protection claim fails.

### 5. Kufi

#### a. Under RLUIPA

##### (i) Mr. Vashone–Caruso's prima facie case
**\*18** Turning first to whether the wearing of a *kufi* is a religious exercise for purposes of RLUIPA, the parties disagree. Mr. Vashone–Caruso contends that wearing a *kufi* is a required obligation of his faith; CDOC contends that the issue is one of cultural, not religious, preference. If CDOC is correct, wearing a *kufi* would not be considered a religious exercise for purposes of RLUIPA.

The Court accepts Mr. Amonette's testimony that, at least for members of the Hanafi school, wearing a *kufi* is a required religious obligation. Mr. Jodeh candidly acknowledged that he did not have personal knowledge of the requirements of the Hanafi school, and that he had to consult with an *imam* on the question. Thus, the Court does not have the benefit of Mr. Jodeh's knowledge of the subject, but must rely on Mr. Jodeh's hearsay repetition of what he was told by that *imam.*Such hearsay, although perhaps a permissible basis upon which Mr. Jodeh may base his opinion, *see*Fed.R.Evid. 703, nevertheless carries with it numerous concerns as to its reliability. The

Court does not know precisely what question Mr. Jodeh put to the *imam,* whether that question was correctly understood by the *imam,* what response the *imam* gave, or whether Mr. Jodeh correctly interpreted that response. In addition, the Court knows nothing about the particular qualifications of the *imam* Mr. Jodeh consulted—for example, whether this *imam* was a member of the Hanafi school, or a particularly learned scholar of Hanafi doctrine. Mr. Jodeh's lack of personal knowledge on the subject is especially telling, insofar as he refused to expressly state that Mr. Amonette's assertion regarding the requirements of the Hanafi school was wrong. In contrast, Mr. Amonette testified based upon his own personal knowledge of the Hanafi school, and did not express any ambivalence about its requirements.

Thus, the Court accepts Mr. Amonette's testimony that adherents of the Hanafi school, such as Mr. Vashone–Caruso, are required by their religion to wear *kufis.*Because, at least in the Hanafi school, a *kufi* is an item of religious, not cultural, significance, the Court finds that Mr. Vashone–Caruso has carried his burden of establishing that the wearing of a *kufi* is a religious exercise protected by RLUIPA.

The next question is whether CDOC's policies substantially burden Mr. Vashone–Caruso's ability to exercise his religion through the wearing of a *kufi.*There can be little dispute on this point. Mr. Vashone–Caruso is limited to wearing his *kufi* only while in his cell and while participating in religious services. Although there was no specific testimony about the amount of time spent by inmates inside and outside their cells at AVCF, the general testimony indicated that inmates in a given housing unit may visit each other's cells and mingle freely in a common area throughout much of the day, that inmates congregate during morning and evening gym periods, daily visits to the prison yard, and during meals. Thus, Mr. Vashone–Caruso must either forego the wearing of his *kufi* or remain confined to his cell during these times. The Court finds this to be a substantial burden on Mr. Vashone–Caruso's ability to exercise his religion by wearing a *kufi.*Accordingly, Mr. Vashone–Caruso has carried his burden of establishing a *prima facie* case under RLUIPA.

##### (ii) The Defendants' burden
**\*19** The burden then shifts to the Defendants to prove a compelling governmental interest that is served by the restriction. The Defendants contend that the compelling interest being served is prison security. Limiting the ability of inmates to uniquely identify themselves, either individually or in groups, helps to prevent disruption. Specifically, Mr.

Case: 3:13-cv-00546-bbc Document #: 29 Filed: 01/15/15 Page 20 of 22
**Caruso v. Zenon, Not Reported in F.Supp.2d (2005)**
2005 WL 5957978

Zenon testified about the need to prevent such unique identification of inmates, explaining that "any uniqueness that occurs in the facility seems to attract attention on the part of our gang members ... I think part of it is the gang mentality where they themselves are constantly seeking some way to stand out in the population." [12] He stated that the 1999 change to the policy regarding headgear came about as a result of increasing gang activity within CDOC. Mr. Zenon did not testify about any specific incidents, but Ms. Sanguinetti testified that there was an incident in which a Jewish inmate at a prison in Trinidad, Colorado was singled out for harassment because he wore a yarmulke.

Prison security is recognized as a compelling governmental interest.*Cutter,* 125 S.Ct at 2124 n. 13 ("prison security is a compelling state interest, and ... deference is due to institutional officials' expertise in this area"). But it is not sufficient for the Defendants to merely identify it as an interest that might be served. The Defendants must present evidence of a particular harm that it seeks to remedy or avoid. Here, the Court finds that the Defendants have carried this burden. Mr. Zenon indicated that the timing of the policy change limiting the wearing of *kufis* and other religious headgear occurred at a time when gang activity was on the increase across CDOC. Moreover, the incident with the Jewish inmate discussed by Ms, Sanguinetti suggests that CDOC's concern was not entirely hypothetical. Although the Court finds the sum total of this evidence to be less than overwhelming, it is sufficient to demonstrate that CDOC's concerns about prison safety are sufficiently particularized and concrete for the Court to find that the regulation of *kufis,* along with all other non-state-issued headgear, [13] serves a compelling interest.

Mr. Vashone–Caruso takes particular umbrage at the notion that he may not self-identify with a *kufi* while other inmates sport highly visible gang-related tattoos. As unfair as such a policy might seem to Mr. Vashone–Caruso, it does not bear directly on the RLUIPA analysis. The Court recognizes that differing treatment of *kufis* and tattoos might serve to demonstrate that CDOC's stated concerns of preventing gang identification are spurious, but the largely unrebutted testimony was that CDOC policies prohibit inmates from receiving tattoos while in prison. Mr. Zenon also testified as to situations where he sought to prevent an inmate with tattoos from displaying them. For example, when an inmate has tattoos on his head, Mr. Zenon testified that he will usually require that inmate to grow his hair out to cover the tattoo. In other circumstances, Mr. Zenon strongly encourages an inmate to cover up a tattoo, even if he cannot require the inmate to have the tattoo physically removed. Far from demonstrating inconsistency, this testimony demonstrates that CDOC's policy is a sincere attempt to limit inmate self-identification. Although Mr. Zenon's efforts might not stifle inmate self-identification through tattoos as effectively as AR 800–1 stifles such self-identification through religious headwear, the evidence nevertheless demonstrates that both approaches are directed at the same goal. The fact that CDOC cannot effectively stamp out all manifestations of uniqueness among prisoners does not mean that they are prohibited from taking any incremental steps towards that end.

**\*20** Similarly, Mr. Vashone–Caruso's complaint that inmates can still self-identify through grooming is without merit. RLUIPA does not require that CDOC enact every conceivable regulation that would further a particular compelling interest; it merely requires that those regulations that *are* implemented be supported by compelling justification. The Court can imagine any number of justifiable reasons why CDOC has chosen to accept the security risks that come with permitting certain styles of inmate grooming, while finding that the risks posed by distinctive headgear are unacceptable. This does not alter the conclusion that the limitation on *kufis* is supported by compelling reasons.

The Defendants also bear the burden of establishing that the regulation is the least-restrictive means of securing the compelling governmental interest of inmate security through uniformity. The evidence here establishes that all inmates are issued a stocking cap and baseball cap, either of which can be worn anywhere. The stocking cap would ostensibly permit Mr. Vashone–Caruso to at least adhere to that tenet of his religion that requires him to cover his head by wearing a brimless hat, while still meeting CDOC's need for uniformity. But the evidence suggests that Mr. Vashone–Caruso is not permitted to wear the stocking cap year-round. Mr. Zenon testified he "tries to restrict" the wearing of the stocking cap in the summer months, as the stocking cap is a thick, primarily cold-weather garment, and CDOC provides the baseball cap as an apparently mandatory "alternative" for warm-weather months. Mr. Vashone–Caruso's testimony corroborates the fact that he is only permitted to wear the stocking cap "during certain months of the year."From this, the Court infers that Mr. Vashone–Caruso is required to wear the baseball cap during the summer months. The baseball cap presents its own problems. As a cap with a bill, if it is worn properly, it is not suitable for Muslims, who are required to touch their head to the ground during prayer. [14] Thus, during the summer

months, Mr. Vashone–Caruso is not able to even wear a state-issued head covering without compromising his ability to practice his religion.

Several alternatives would place less of a restriction on Mr. Vashone–Caruso's ability to exercise his religion while still meeting CDOC's compelling need for uniformity. CDOC could permit inmates to wear the stocking cap year-round. CDOC could replace the baseball cap with a warm-weather version of the stocking cap, made of a thinner fabric. CDOC could permit Muslims to wear the baseball cap backwards during prayer times, such that the inmate could still touch his head to the ground while wearing the cap. CDOC could modify its policies to permit inmates to wear religious headgear so long as they remain within their housing unit, just as it currently does with "do rags." Each of these, and several other conceivable alternatives, would preserve CDOC's articulated compelling interest of inmate uniformity, while making it possible for inmates such as Mr. Vashone–Caruso to practice their religion more fully. However, because CDOC bears the burden of establishing that no less restrictive alternative exists, it has failed to carry its burden on this element, and Mr. Vashone–Caruso is entitled to judgment on his RLUIPA claim with regard to the *kufi*.

**b. Under Equal Protection**

**\*21** Mr. Vashone–Caruso's Equal Protection argument with regard to the *kufi* is minimal. He contends that he is similarly-situated to Rastafarian inmates, who are permitted to wear their hair in distinctive dreadlocks, but he is prohibited from wearing an equally distinctive *kufi*. Such an argument appears to be simply a recasting of Mr. Vashone–Caruso's "grooming" argument. Once stripped of the "distinctiveness" argument—which might be relevant to the RLUIPA claim but is of no consequence in Equal Protection analysis—the Court finds that Mr. Vashone–Caruso is not similarly-situated to Rastafarian inmates. Indeed, by Mr. Vashone–Caruso's own argument in his closing brief, he enjoys the same liberal grooming policies as the Rastafarian inmates do, insofar as he has been permitted to grow a lengthy beard, just as the Rastafarians have been permitted to grown lengthy dreadlocks. There is no contention that the Rastafarians, or any other religious group, have been given greater latitude than Muslims with regard to wearing headgear. Accordingly, the Defendants are entitled to judgment on the Equal Protection claim concerning *kufis*.

**6. Remedy**

Having found that the Defendants are violating Mr. Vashone–Caruso's constitutional rights with regard to his diet and the wearing of a *kufi*, the Court turns to the question of remedy.

With regard to the religious diet, Mr. Vashone–Caruso has identified a particular acceptable alternative to current CDOC policies, namely, that he be allowed to receive the standard kosher meal without being required to change his religious designation. Based on the record, it appears that this alternative would restore Mr. Vashone–Caruso's constitutional rights with regard to this issue, while posing the minimum of intrusion upon CDOC's broad discretion to administer its facilities as it sees fit. A remedy directing CDOC to make the kosher meal available to Mr. Vashone–Caruso without requiring him to modify his religious designation is thus appropriate.

A more complex situation exists with regard to the *kufi*. Mr. Vashone–Caruso's requested remedy—that CDOC restore the old policy permitting him to wear a white *kufi* anywhere—is inconsistent with CDOC's compelling interest in preventing inmate self-identification. However, the Court has described a number of less-restrictive alternatives that would preserve CDOC's compelling interest while better accommodating Mr. Vashone–Caruso's religious exercise. Mindful that its place is merely to adjudicate, and that great deference is owed to prison administrators in the performance of their duties, *Cutter, supra.* at n. 13, the Court will not compel CDOC to adopt any particular alternative as a remedy. The Court will merely find that section IV.P.7 of AR 800–1, as applied to the circumstances described here, violates Mr. Vashone–Caruso's First Amendment rights, and will enjoin the Defendants to cease such violation. How the Defendants choose to carry out the Court's instruction to cease the violation is a matter left to their sound discretion, subject only to the limitation that it must give effect to Mr, Vashone–Caruso's constitutionally-protected rights.

*CONCLUSION*

**\*22** For the foregoing reasons, the Court will enter judgment in favor of Mr. Vashone–Caruso declaring that the Defendants are violating his First Amendment rights with regard to his diet and the wearing of a *kfui,* compelling the Defendants to permit Mr. Vashone–Caruso to participate in the kosher meal program without having to change his religious designation, and compelling the Defendants to take such action as may be appropriate to cease the violation of

Mr. Vashone–Caruso's constitutional rights with regard to his headwear. The Court will enter judgment in favor of the Defendants with regard to Mr. Vashone–Caruso's demand for weekly religious education classes. A separate judgment

will enter contemporaneously with these Findings of Fact and Conclusions of Law.

Footnotes

1    As stated in the Court's prior Order **(# 250),** the Court delayed issuing its ruling in this action pending the United States' Supreme Court decision in *Cutter v. Wilkinson, infra.*

2    At the beginning of the first day of trial, the Court granted, over objection, the oral motion by Mr. Vashone–Caruso to amend the complaint to designate the present Defendants in their official capacities. At the close of the Plaintiff's case near the end of the second day of trial, Mr. Vashone–Caruso made another oral motion to amend the complaint to name a new defendant, the Executive Director of the Colorado Department of Corrections. The Court deferred ruling on this motion, and will address it in detail herein.

3    An *imam* can be either the most knowledgeable elder in a Muslim community, or a specially trained and credentialed individual who is authorized to issue a written or oral opinion interpreting or applying Islamic law. Mr. Vashone–Caruso serves as an *imam* in the first capacity only.

4    There was some dispute in the record as to whether the vegetarian entree could become contaminated by careless preparation or handling of the standard entree. For example, Mr. Vashone–Caruso testified as to an incident in which a fellow inmate's vegetarian meal was contaminated by a drop of pork gravy spilled from the standard entree. However, Donna Zavislan, CDOC's Food Services Manager, testified that kitchen workers are trained to carefully prepare and handle vegetarian meals to avoid such contamination. For reasons discussed later, it is unnecessary to address whether contamination of the vegetarian meal occurs.

5    Ms. Zavislan also testified about other Administrative Regulations which govern aspects of the preparation of the vegetarian entree, such as AR 1550–2. However, these regulations were not offered as evidence.

6    Mr. Kharrubi's actual title was Islamic Coordinator, a position that was created in 1991 as the result of another lawsuit against CDOC. The position was eliminated approximately three years later due to budget cuts, although Mr. Kharrubi continued to serve as a volunteer chaplain for some period of time thereafter.

7    Assuming a 40–hour work week, Ms. Sanguinetti would thus spend 4 hours per week recruiting volunteers, and 2.5 minutes (1% of 4 hours) of each week actively seeking Muslim volunteers.

8    It is a tenet of Islam that the adherent's head come into contact with the ground during daily prayers. The presence of a rim or bill on headgear would prevent that contact.

9    Religious education classes are not specifically mentioned in the Complaint, but there are general references to a denial of access to "religious gatherings." Given Mr. Vashone–Caruso's *pro se* status at the time of the original Complaint, the Court construes this assertion liberally to include gatherings of Muslim adherents for the purpose of religious education and discussion.

10   There is no indication that alcohol or foods containing alcohol are served in any CDOC facility.

11   That is not to say that the cumulative cost of making specialized meal plans available on a broad basis can never be a compelling governmental interest. Upon a showing—using actual and current data (or, at least, explaining why nine-year old estimates are nevertheless reliable)—that making kosher meals available more broadly would seriously affect CDOC's finances, the Court might be able to find that a policy that differentiated among inmates based on their religious beliefs would survive strict scrutiny. However, on the sparse evidentiary record in this case, the Court cannot make such a finding.

12   The Court observes that Mr. Zenon's concerns were, most likely unwittingly, a nearly verbatim echo of the testimony of both Mr. Vashone–Caruso and Mr. Amonette. They each emphasized that it was important for a Muslim to wear a *kufi* so as to distinctly stand out from the crowd and be recognizable as a member of the Islamic community, and not to appear as non-Muslims appear.

13   The Court notes that Ms. Sanguinetti testified that inmates could purchase "do rags" to wear about their own housing unit, but not in general population activities. This would appear to rebut, in part, the compelling interest in inmate uniformity, at least within the housing units themselves. However, Mr. Vashone–Caruso has not presented such an argument in his closing brief, and the Court will not explore the matter *sua sponte.*

14   There was no testimony elicited about whether inmates can wear the baseball caps backwards in certain circumstances.

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.